Filed 9/29/20  K.N. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| K.N.,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF FRESNO COUNTY,<br><br>    Respondent;<br><br>FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Real Party in Interest. | F081370<br><br>(Super. Ct. No. 19CEJ300300-1) |
| J.N.,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF FRESNO COUNTY,<br><br>    Respondent;<br><br>FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Real Party in Interest. | F081385<br><br>(Super. Ct. No. 19CEJ300300-1)<br><br>**OPINION** |

# THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ. Gary L. Green, Commissioner.

K.N., in pro. per., for Petitioner K.N.

J.N., in pro. per., for Petitioner J.N.

No appearance for Respondent.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

Petitioners J.N. and K.N., husband and wife, are the parents of now one-year-old Caleb N., who was adjudged a dependent of the Fresno County Juvenile Court in October 2019 because of the parents' neglect of his seven older siblings in previous dependency cases. In June 2020, following a contested dispositional hearing, the court denied the parents reunification services under Welfare and Institutions Code section 361.5, subdivision (b)(10) and (11)[1] after finding they failed to make reasonable efforts to remedy the problems requiring the siblings' removal and it was not in Caleb's best interest to provide them services. A section 366.26 hearing was set for October 15, 2020.

Petitioners each filed an identical extraordinary writ petition, in propria persona, challenging the juvenile court's setting order. (Cal. Rules of Court, rules 8.450–8.452.)[2] We consolidated their writ petitions on our own motion and deny the petition.

---

[*] Before Levy, Acting P.J., Detjen, J. and Peña, J.

[1] Statutory references are to the Welfare and Institutions Code.

[2] Rule references are to the California Rules of Court.

2

## PROCEDURAL AND FACTUAL SUMMARY

Dependency proceedings were initiated in Fresno County in August 2019 at the time of Caleb's birth after mother disclosed she had seven other children, ranging in age from 19 months to nine years of age, who were removed from her custody in San Bernardino and Riverside Counties. She and father also had a criminal case pending and the next court date was scheduled for October 31, 2019.

*Prior Dependency Proceedings in San Bernardino and Riverside Counties*

The parents have a lengthy child welfare history in San Bernardino and Riverside Counties. In September 2015, the eldest five children were taken into protective custody in San Bernardino County after the police went to the family home at 2:00 a.m. to investigate the broken femur of their then three-year-old daughter Isabella and found the oldest daughter, then five, and oldest son, then two, restrained in their car seats with rope restricting their hand and arm movement. The parents explained that the children were hurting and scratching themselves and handling their feces. The parents researched the methods used by hospitals to restrain children and devised " 'hard mittens,' " which they fashioned out of plastic Kool-Aid jugs, that they placed over the children's hands and secured around their wrists with rope. They restrained the children for up to four hours at a time. In addition to restraining the children, the parents also restricted their food and water intake and neglected their basic medical needs. Several of them were delayed and acted aggressively. One ate her feces and two others played with their feces. Several developed anemia and problems associated with constipation. The two youngest, then 16 and four months of age, were so significantly underweight that they were at risk of failure to thrive. The parents were arrested and convicted of felony child cruelty. The San Bernardino County Juvenile Court adjudged the children dependents under section 300, subdivisions (b) (failure to protect), (c) (serious emotional damage) and (i) (cruelty), and ordered the parents to participate in reunification services. The parents

were participating in reunification services when their sixth child, a son, was born. He was also removed from their custody. In November 2017, the San Bernardino County Juvenile Court ordered a permanent plan of legal guardianship for the oldest child and adoption for the remaining five children. In January 2018, mother gave birth to her seventh child, a daughter, in Riverside County. The parents retained custody of the baby until approximately a month later when they took her to the emergency room after she had been vomiting for a week. She was not tolerating formula, so they were feeding her cow's milk and water based on research they obtained online. The doctor determined the baby had an allergic reaction. The juvenile court ordered her removed, denied the parents reunification services and terminated their parental rights in January 2019.

*Fresno County Dependency Proceedings*

The parents told the investigating social worker from the Fresno County Department of Social Services (department) they had a hard time finding housing because of their criminal record and moved to Fresno because of the lower hotel rates. Father planned to commute to the Bay Area for work. They denied any current or past domestic violence or substance abuse. They also denied any mental health problems, stating they had been assessed multiple times in Riverside and San Bernardino Counties and " 'passed.' " Asked why the other children were removed, father explained that Isabella slipped and fell into the splits position, causing a fracture. Although Isabella's injury was deemed accidental, the parents waited for two days to seek medical treatment for her, causing her unnecessary pain and risking medical complications. The parents pled guilty to willful cruelty to a child in exchange for six years of felony probation. They expected that the court would either reduce their felony convictions to misdemeanors at the hearing in October 2019 or expunge them.

On August 27, 2019, the department requested a protective custody warrant for Caleb, hoping to serve it while he was still in the hospital. However, the juvenile court

4

denied it and set a hearing for September 3.  The following day, social workers met with the parents to discuss their concerns about the parents' inability to apply basic parenting skills despite having completed reunification services.  The social workers decided to file a dependency petition, concluding voluntary family maintenance services were not an option, and advised the parents to attend the upcoming hearing.  The following day, a social worker attempted unsuccessfully to contact the parents at the extended stay hotel where they were residing and by telephone.

On September 3, 2019, the juvenile court issued a protective custody warrant for Caleb.  The department removed him from the parents' physical custody and filed a first amended dependency petition alleging under section 300, subdivisions (b) and (j) the parents' history of neglecting Caleb's siblings placed him at risk of similar neglect.  Caleb was placed in foster care.

The juvenile court ordered Caleb detained pursuant to the first amended petition and ordered the department to offer the parents parenting classes, substance abuse evaluations and recommended treatment, mental health and domestic violence assessments and random drug testing.  The court also ordered supervised weekly visitation.  The parents reported to the court they intended to move to the Bay Area to obtain employment.  They were provided information to participate in services in San Mateo County.

The parents appeared at the jurisdictional hearing on October 1, 2019, and submitted the matter of jurisdiction.  The juvenile court found the allegations true, adjudged Caleb a dependent child as alleged in the first amended petition and set the matter for disposition on November 14, 2019.

On November 13, 2019, a panel of social workers met with the parents to discuss the appropriateness of providing them reunification services.  The parents did not take responsibility for why Caleb's siblings were removed and did not have a plan for

providing Caleb a stable home.  In its dispositional report submitted the following day, the department recommended the juvenile court deny the parents reunification services under section 361.5, subdivision (b)(10) and (11) based on their failure to reunify with Caleb's siblings and remedy the problem that necessitated their removal.

Beginning in November 2019 and over the following two months, the parents filed several petitions under section 388, requesting sibling visits for Caleb, Caleb's return to their custody under family maintenance services and withdrawal of their request to transfer the case to Santa Clara County where father was working.  The court summarily denied the petition requesting Caleb's return under family maintenance services and set a hearing on the other requests.  The hearing on the section 388 petitions tracked the dispositional hearing until the parents withdrew them on June 11, 2020.

The juvenile court set a contested dispositional hearing, which was continued and ultimately conducted on June 26, 2020.  Meanwhile, the parents completed substance abuse evaluations and were found not to have a substance abuse problem.

Social worker Carlos Aguila from the Nugent Family Counseling Center in San Jose provided a letter dated June 17, 2020, summarizing his impression of the parents. He was unable to judge their parenting deficiencies, having only met with them four times.  They told Aguila they had limited support and their poverty, homelessness and unemployment severely impacted their stability.  They believed they were doing the best they could, and that child protective services overreacted to their parenting methods. Aguila observed father as the clear leader, who often spoke for the couple.  They were cordial and religious and believed prayer was key to alleviate the autistic symptoms in two of their children, a reference to the oldest daughter who was diagnosed with Autism Spectrum Disorder and the oldest son who showed signs of the disorder.  Mother was pregnant and attending to her own prenatal care.

6

On June 23, 2020, the parents' convictions were set aside, and their probation was terminated.

*Contested Dispositional Hearing*

The parents testified and were asked to explain why Caleb was removed from their custody. Mother said it was because the social worker was unable to reach them by telephone and they were not at the extended stay hotel. The social worker attempted to contact them by mother's cell phone even though the social workers were aware her phone did not work well. They were not at the extended stay hotel when the social worker arrived because father was at work and mother was with Caleb at the doctor's office. Father testified Caleb was removed because of the prior dependency case and the social worker's inability to get in touch with him and mother. The older children were removed because of the way he and mother restrained them. He was trying to "keep the peace in the house" and didn't realize he was breaking the law.

Mother testified she and father were participating in services to better parent Caleb; they completed mental health and substance abuse assessments and 15 of the 16 classes required to complete a parenting program. They were also participating in random drug and alcohol testing. Mother learned in her parenting class how to address her children's medical conditions and when to seek professional help. She was not participating in mental health therapy but would if ordered to do so. The provider who completed their mental health assessment met with them for a few sessions. He had experience with children with behavioral problems. Her visits with Caleb were via video because of COVID-19 and the statewide shelter in place. She read to him, talked to him and taught him his numbers.

Mother was asked on cross-examination to describe what was inappropriate parenting in the 2015 dependency case. She said they were told by the Barstow City Police that their timeout tactics used to handle the children's violent behavior could only

be used by a licensed professional. Her parenting instructor and counselor were working with her and father to comply with the law and understand when to seek help. She believed she and father needed services to handle the children's behavior. She did not believe she had an anger issue. One of her service providers recommended she participate in anger management not because she had a problem with anger but because the counselor wanted her to express herself more. She believed she needed a team of specialists to help her raise the children as it was her and father's goal to have all the children returned to their custody.

Father had a better understanding of autism since the siblings' removal and understood their behavior was not disobedience. He also learned there are many resources available to assist with autistic children. He believed he could safely parent Caleb and was willing to participate in any services the court and department deemed necessary. He did not believe he had mental health problems but acknowledged the possibility. He agreed with mother that they needed a team of professionals and thought they could benefit from family therapy and mental health counseling.

On cross-examination, father was asked whether he and mother suggested the care provider change Caleb's diet to goat milk. He said they did not but discussed what formula to give him. He testified he and mother were required to take a yearlong child abuse program as part of their probation. They completed the program before Caleb was removed. Father learned how to deescalate situations with the children and to foster understanding in a loving environment.

Social worker Sandra Sandoval testified she had managed the case since October 2019. Since that time, she had seen no changes in the parents' behavior and they never accurately described the reason for Caleb's removal. Nor had they expressed a desire to benefit from services, just a desire to finish the case plan. She testified mother was participating in a parenting class and random drug and alcohol testing. She had not

8

received any positive test results for mother. She requested a progress report from mother's parenting instructor but was told she would receive one after mother finished the class. The parenting instructor did not express any concerns about mother's participation. Mother's mental health provider, however, was concerned about mother's inability to understand why the children were removed from her care and believed she needed extensive mental health services. Father's drug and alcohol test results were negative and the only information Sandoval had about his parenting program was that he was participating.

Sandoval testified mother suggested the care provider give Caleb goat's milk for a rash on his forehead during a visit on December 15, 2019. However, the visitation coordinator advised the care provider not to change Caleb's formula without consulting his doctor. There was no further mention of giving Caleb goat's milk.

Following testimony, mother's attorney moved to admit visitation narratives involving mother and Caleb, service provider letters and a minute order reflecting that the criminal conviction had been expunged.

The parents' attorneys argued section 361.5, subdivision (b)(10) and (11) did not apply because the parents made subsequent efforts to treat the problem by engaging in services. Mother's attorney further argued that even if the statute applied, it would be in Caleb's best interest to provide mother services because he was positively bonded to her.

The juvenile court ordered Caleb removed from parental custody and denied the parents reunification services as recommended, stating, "The Court is highly concerned that the parents have not come to grips with why the older children were removed and what they have done subsequently with regards to [Caleb] …." The court commended them for attempting to better themselves through services but did not believe they had remedied the problem. The court stated, "Obviously their history speaks for themselves.

The gravity of the problem of the removals continues." The court found Caleb was not strongly bonded to his parents.

## DISCUSSION

### I. Writ Proceedings in the Appellate Court

The purpose of extraordinary writ proceedings is to allow the appellate court to achieve a substantive and meritorious review of the juvenile court's orders and findings issued at the setting hearing in advance of the section 366.26 hearing. (§ 366.26, subd. (*l*)(4).)

Rule 8.452, which sets forth the content requirements for an extraordinary writ petition, requires the petitioner to identify the error(s) he or she believes the juvenile court made and to support each alleged error with argument, citation to legal authority, and citation to the appellate record. (Rule 8.452(b).) In keeping with rule 8.452(a)(1), we will liberally construe a writ petition in favor of its adequacy where possible, recognizing that a parent representing him or herself is not trained in the law. Nevertheless, the petitioner must at least articulate a claim of error and support it by citations to the record. Failure to do so renders the petition inadequate in its content and the reviewing court need not independently review the record for possible error. (*In re Sade C*. (1996) 13 Cal.4th 952, 994.)

Petitioners did not technically comply with rule 8.452 in that they did not specifically identify the findings and orders they believe are erroneous or set forth legal arguments with citation to the evidence in the record and legal authority. However, they did identify specific statutes which correspond to the juvenile court's critical findings and orders; i.e., section 300, subdivisions (b) and (j) on which the juvenile court adjudged Caleb a juvenile dependent, section 361, subdivision (c)(1), the authority on which the court ordered him removed from parental custody and section 361.5, subdivision (b)(10) and (11), the authority on which the court denied petitioners reunification services.

10

Under each of the statutes, petitioners identified evidence they assert supports a ruling in their favor.

Real party in interest urges this court to conclude petitioners' writ petition is inadequate for appellate review and dismiss it. Although we have such discretion, we decline to exercise it in this case and will construe the writ petition as challenging the sufficiency of the evidence to support the juvenile court's jurisdictional findings, removal order and order denying reunification services. We conclude substantial evidence supports the juvenile court's rulings.

## II. Child Welfare Services Generally

The purpose of dependency statutes is to "provide maximum safety and protection for children who are … being physically, sexually, or emotionally abused, being neglected, or being exploited and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm. This safety, protection, and physical and emotional well-being may include provision of a full array of social and health services to help the child and family and to prevent reabuse of children. The focus shall be on the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child." (§ 300.2.)

### A. Jurisdictional Authority

The juvenile court's statutory authority to intervene on behalf of a child who is suspected of being neglected or abused comes from section 300. If the juvenile court finds by a preponderance of the evidence the child is described by any one of the subdivisions contained in that section, the court may exercise its dependency jurisdiction over the child. Here, the court found Caleb was described by section 300, subdivisions (b) and (j) which provide in relevant part:

> "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:

11

"(b)(1)  The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent … to adequately supervise or protect the child, … or by the willful or negligent failure of the parent … to provide the child with adequate food, clothing, shelter, or medical treatment ….  [¶] … [¶]

"(j)  The child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions. The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of their sibling, the mental condition of the parent …, and any other factors the court considers probative in determining whether there is a substantial risk to the child."

## B. Removal

If the juvenile court finds the minor child is described under any one of the subdivisions of section 300, it may remove the child from the parent but only if it finds, by clear and convincing evidence, there is or would be a substantial danger to the child's physical or emotional well-being if the child were returned home and there are no reasonable means by which the child's physical health can be protected short of removal. (§ 361, subd. (c)(1).)

"The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion." (*In re Jose M*. (1988) 206 Cal.App.3d 1098, 1103–1104.)  "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent.  [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child.' [Citation.]  The court may consider a parent's past conduct as well as present circumstances." (*In re N.M*. (2011) 197 Cal.App.4th 159, 169–170.)

12

## C. Denial of Reunification Services

When the juvenile court removes a child from parental custody at the dispositional hearing, it must provide reunification services to the child and the parents. (§ 361.5, subd. (a).) The purpose of providing reunification services is to "eliminate the conditions leading to loss of custody and facilitate reunification of parent and child. This furthers the goal of preservation of family, whenever possible." (*In re Baby Boy H*. (1998) 63 Cal.App.4th 470, 478.) However, subdivision (b) of section 361.5 exempts from reunification services " ' "those parents who are unlikely to benefit" ' [citation] from such services or for whom reunification efforts are likely to be 'fruitless.' " (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1120.) The 17 different paragraphs set forth in subdivision (b) of section 361.5—which authorize denial of reunification services under various specific circumstances—are sometimes referred to as " 'bypass' " provisions. (*Melissa R. v. Superior Court* (2012) 207 Cal.App.4th 816, 821.)

Here, the juvenile court denied petitioners reunification services under section 361.5, subdivision (b)(10) and (11), which allows the juvenile court to deny a parent reunification services when the court previously terminated parental rights to the child's sibling or half sibling or where it previously ordered termination of reunification services when the parent failed to reunify with a sibling or half sibling, and the parent failed to subsequently make reasonable efforts to address the problems leading to removal of the sibling or half sibling.

Once it has been determined one of the bypass provisions applies, " ' "the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources." ' " (*In re William B*. (2008) 163 Cal.App.4th 1220, 1227.) Thus, if the juvenile court finds a provision of section 361.5, subdivision (b), applies, the court "shall not order reunification for [the] parent … unless the court finds, by clear and convincing evidence, that reunification is in the best interest

of the child." (§ 361.5, subd. (c)(2).) "The burden is on the parent to … show that reunification would serve the best interests of the child." (*In re William B.*, at p. 1227.)

## III. Standard of Review

On appeal, we review jurisdictional and dispositional findings and orders under the substantial evidence standard of review. (*In re A.S.* (2011) 202 Cal.App.4th 237, 244.) Substantial evidence exists when the evidence is "reasonable in nature, credible, and of solid value," so that "a reasonable mind would accept [it] as adequate to support [the] conclusion." (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) Under this standard of review, we consider the record as a whole, in a light most favorable to the juvenile court's findings and conclusions, and we defer to the juvenile court on any issues of credibility of the evidence. (*In re Tania S*. (1992) 5 Cal.App.4th 728, 733–734.) The existence of evidence of some support for a contrary finding will not defeat the finding. (*In re Manuel G.* (1997) 16 Cal.4th 805, 823.) Moreover, "[w]hen the sufficiency of the evidence to support a finding or order is challenged on appeal, even where the standard of proof in the trial court is clear and convincing evidence, the reviewing court must determine if there is any substantial evidence—that is, evidence which is reasonable, credible and of solid value—to support the conclusion of the trier of fact." (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75.) However, we bear in mind that the juvenile court was required to make the finding on the heightened clear and convincing evidence standard of proof. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.)

## IV. Application

### A. *Jurisdiction*

Petitioners contend they were attentive care providers to Caleb while he was in their care. They provided him a safe and healthy home environment as well as adequate food, clothing, shelter and medical treatment. They also assert they did not neglect or abuse Caleb or his siblings.

14

As a preliminary matter, we note that petitioners submitted on the issue of jurisdiction at the jurisdictional hearing, which means they did not challenge the evidence alleged in the petition. Ordinarily, a parent may not challenge the sufficiency of the allegations in a dependency petition on appeal if he or she did not raise the issue in the dependency court. (*In re John M*. (2012) 212 Cal.App.4th 1117, 1123.) Failure to do so results in forfeiture of the issue. Even assuming, however, for the sake of argument petitioners did not forfeit their right to challenge the sufficiency of the evidence to support a finding of jurisdiction, we conclude substantial evidence supports it.

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E*. (2009) 171 Cal.App.4th 438, 451.)

Here, we conclude there was sufficient evidence to support the jurisdictional finding pursuant to subdivision (j) of section 300. Therefore, we need not consider whether the other alleged statutory grounds for jurisdiction (i.e., the subdivision (b) allegations) were supported by the evidence.

Caleb's siblings were found to be juvenile court dependents because they suffered serious physical harm under section 300, subdivision (b), serious emotional damage under subdivision (c) and were subjected to acts of cruelty under subdivision (i) because petitioners used alternative methods of discipline that involved restraining the children in car seats with hard mittens and rope for long periods of time, restricting their food and water intake and neglecting their medical, developmental, educational and mental health needs. In determining that Caleb was at a substantial risk of similar abuse under

15

subdivision (j), the court could reasonably consider the severity of the abuse and neglect that Caleb's siblings suffered, including the pain Isabella endured from lack of medical treatment, the hunger and malnourishment from lack of food, and the self-harm from their unmanaged behavioral problems. The court could also reasonably infer that Caleb could be at risk of similar neglect given petitioners' propensity to rely on their own knowledge in caring for their children rather than consulting with medical professionals.

### B. Removal

Petitioners contend Caleb did not need to be removed from their custody because they did not harm him. They point out that they do not have a mental illness or developmental delay, they do not use drugs or alcohol and their criminal charges were dismissed. Whether a parent has directly harmed a dependent child is not the only basis for removing a child from parental custody. The juvenile court is justified in removing a child based strictly on a substantial risk that the parent will harm the child. Here, petitioners demonstrated they posed a very serious risk of harm to Caleb by virtue of the severity of neglect his siblings suffered in their care and petitioners' failure to appreciate the harm they inflicted on their children. The juvenile court does not have to wait until the child is harmed before removing the child from parental custody. Further, although there is very little information about it, there were concerns about mother's mental health. According to Sandoval, mother's mental health provider believed she needed extensive mental health services.

### C. Denial of Services

Petitioners contend they made significant efforts to remedy the problem that necessitated the siblings' removal. Mother points out that she has a cell phone with a better connection. They also fault the department for delaying implementation of their case plan, including not providing them a domestic violence assessment, which they claim is still pending approval, and withdrawing payment for their parenting class before

16

they were able to complete it. They also assert Sandoval lied when she testified mother suggested putting goat's milk on Caleb's face at the visit on December 15, 2019. They point out Sandoval was not at that visit.

The question of whether petitioners made subsequent reasonable efforts to resolve the problems necessitating the removal of Caleb's siblings is much greater than mother obtaining a more efficient cell phone or their participating in the services offered at detention. In this case, it has to do with whether they acquired basic parenting skills that would help them make better decisions in caring for their children. The juvenile court concluded that they had not come to grips with how their parenting harmed the children and the evidence bears that out. Petitioners continued to rely on their own wisdom and judgment in deciding how Caleb should be fed, for example, rather than consulting his pediatrician. According to the visitation record for December 15, mother noticed that Caleb had a rash on his forehead and wanted to change his formula. The visitation coordinator had to remind her that changing his formula could cause an allergic reaction and she should not change his formula without consulting the care provider. Petitioners rightly point out that there was no mention of goat's milk at that visit and that Sandoval was not present. However, the point for purposes of determining subsequent reasonable efforts is that petitioners continue to make independent judgments about caring for their children instead of consulting the professionals. Unfortunately, the consequences in the past have been dire. On that evidence, the juvenile court could find that subdivision (b)(10) and (11) of section 361.5 applied to petitioners. Having concluded Caleb was not bonded to petitioners, the court could also conclude providing them reunification services would not serve Caleb's best interests.

We conclude substantial evidence supports the juvenile court's exercise of its dependency jurisdiction over Caleb, its order removing him from parental custody and its

order denying petitioners family reunification services.  Consequently, we deny the extraordinary writ petition.

## DISPOSITION

The petition for extraordinary writ is denied.  This court's opinion is final forthwith as to this court pursuant to rule 8.490(b)(2)(A).

18